1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 7/6/10**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| C&C JEWELRY MFG., INC.,<br><br>              Plaintiff,<br><br>      v.<br><br>TRENT WEST,<br><br>              Defendant.<br>_____<br>And Related Counter Claims | Case No. 09-1303-JF (HRL)<br><br>ORDER[1] CONSTRUING CLAIMS OF UNITED STATES PATENT NOS. 6,928,734; 6,990,736; 7,032,314; AND 7,076,972<br><br>[re: document nos. 52 and 80] |

On March 31, 2010, the Court held a hearing for the purpose of construing disputed terms in the claims of United States Patent Nos. 6,928,734 ("the '734 patent"), 6,990,736 ("the '736 patent"), 7,032,314 ("the '314 patent") and 7,076,972 ("the '972 patent") (collectively, "the patents in suit"). After consideration of the arguments and evidence presented by the parties and the relevant portions of the record, the Court will construe the disputed terms as set forth below.

## I. BACKGROUND

The patents in suit involve jewelry rings made of tungsten carbide and methods for

_____

[1]This disposition is not designated for publication in the official reports.

1  making such rings.  Plaintiff C&C Jewelry Manufacturing, Inc. ("C&C") filed this action seeking
2  a judicial declaration that the jewelry rings it manufactures do not infringe the patents in suit or
3  that the patents in suit are invalid and/or unenforceable.  Defendant Trent West ("West") has
4  filed counterclaims, alleging that the jewelry rings manufactured by C&C infringe the patents in
5  suit.

6      The '736, '314, and '972 patents are continuations-in-part of Application No. 149,796,
7  filed on September 8, 1998, now U.S. Patent No. 6,062,045.  The '734 patent issued from
8  Application No. 426,054 that was filed on April 28, 2003.  The specifications of the patents are
9  similar, although each contains some additional material.  The inventions generally relate to
10  methods for making jewelry from tungsten carbide.  The '734 patent is directed to jewelry rings.
11  The '314, '736, and '972 are directed to methods of making jewelry rings and finger rings.

12                    **II.  LEGAL STANDARDS**

13      Claim construction is a question of law to be decided by the Court.  *Markman v.*
14  *Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd* 517 U.S. 370, 116 S.Ct.
15  1384 (1996).  The patentee's use of a claim term in the specification is highly relevant to
16  understanding the proper context in which the term is used.  *Phillips v. AWH Corp.*, 415 F.3d
17  1303, 1315 (Fed. Cir. 2005).  The specification is the "single best guide to the meaning of a
18  disputed term." *Id.*, citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.
19  1996).

20                    **III.  DISCUSSION**

21  **A.    West's motion for leave to submit additional evidence**

22      Subsequent to the claim construction hearing, West moved for leave to submit additional
23  evidence relating to his United States Patent Application No. 11/347,304 ("the '304
24  application"), entitled Methods of Making Tungsten Carbide-Based Annular Jewelry Rings.
25  West seeks to submit the Notice of Allowance, claims 1-18, and the information disclosure
26  statements relating to the '304 application.  The information disclosure statements include
27  C&C's invalidity contentions regarding the patents in suit.  West contends that the allowance of
28  the '304 application over C&C's invalidity contentions is probative with respect to the

1   construction of the claims of the patents in suit.  However, the validity of the patents in suit is an

2   issue separate from the construction of the claims.  While the '304 application may be somewhat

3   relevant to the instant claim construction, evidence with respect to the '304 application is

4   extrinsic to the record of the patents in suit.  While "extrinsic evidence can help educate the court

5   regarding the field of the invention and can help the court determine what a person of ordinary

6   skill in the art would understand claim terms to mean", *Phillips*, 415 F.3d at 1319, extrinsic

7   evidence is "less significant than the intrinsic record in determining 'the legally operative

8   meaning of claim language.'" *Id.* at 1317.  Accordingly, West's motion for leave to submit

9   additional evidence will be denied.

10  **B.    The relevant art**

11          West contends that the relevant art pertains to "jewelry finger rings" and proposes that a

12  person of ordinary skill in the art possesses "at least five years of hands on experience or

13  supervisory experience in making jewelry finger rings with a knowledge of the soft metals and

14  conventional methods, equipment and tools utilized for manufacturing and finishing such rings."

15  (West's Opening Claim Construction Brief ("West's CC Brief") at 5.)  In support, West submits

16  the declaration of Marc A. Kuppersmith, a jewelry maker with over thirty years of experience.

17  (*See* Docket No. 54 (the "Kuppersmith Decl.").[2])  West's proposed level of ordinary skill appears

18  similar to the level of skill ascertained in another jewelry patent dispute.  *See Pandora Jewelry,*

19  *LLC v. Chamilia, LLC*, No. CCB-06-600, 2007 WL 2908734, *1 n.2 (D.Md. September 27,

20  2007) (noting that the parties agreed that a person of ordinary skill in the art "includes a person

21  with knowledge of jewelry design and at least three years of specialized training or ten years of

22  work in jewelry design.").

23          Preliminarily, C&C argues that the Court need not determine the relevant art or the level

24  of skill in the art at this time.  (C&C's Claim Construction Brief (C&C's CC Brief") at 2.)  It

25  points out that West, in a claim construction hearing in another case before this Court, did not

---

27
28          [2]  "[E]xtrinsic evidence can help . . . the court determine what a person of ordinary skill in
    the art would understand claim terms to mean".  *Philiips*, 415 F.3d at 1319

3

1  address the relevant art or the level of ordinary skill.  However, the alleged infringer in that case

2  did not challenge the patents for "indefiniteness" under 35 U.S.C. § 112, as C&C does here.

3      The indefiniteness inquiry "asks whether one skilled in the art would understand the

4  bounds of the claim when read in light of the specification." *AllVoice Computing PLC v. Nuance*

5  *Communs., Inc.*, 504 F.3d 1236, 1240 (Fed. Cir. 2007) (citing *Miles Labs., Inc. v. Shandon, Inc.*,

6  997 F.2d 870, 875 (Fed. Cir. 1993)).  The "proficiency of the hypothetical person of ordinary

7  skill in the art . . . is essential to administering the definiteness test". *Id.*  Also, "[t]he degree of

8  precision necessary for adequate claims is a function of the nature of the subject matter." *Miles*

9  *Lab.*, 997 F.2d at 875 (citing *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367,

10  1385 (Fed. Cir. 1986).  Thus, in order to evaluate C&C's definiteness challenge, the Court must

11  ascertain the relevant field of art and the ordinary level of skill in that art.

12      C&C contends that the relevant art is metal working and material science.  Subsequent to

13  the hearing on the instant motion, in connection with its opposition to West's motion for leave to

14  submit additional evidence, C&C requested that the Court consider the declaration of Richard

15  Peattie, who holds a bachelor's degree in mechanical engineering and has over thirty years of

16  experience with "manufacturing conventional and tungsten parts".  (Peattie Declaration, C&C's

17  Opp'n to West's Mot. for Leave to Submit Additional Evidence, Ex. 3 ("Peattie Decl.") ¶ 2.)

18  West submitted the Peattie declaration in support of United States Patent Application No.

19  11/487,456 ("the '456 application"), entitled "Tungsten carbide-based finger rings".[3]  West also

20  cited to the Peattie declaration in support of his appeal brief filed in connection with the '304

21  application.  West offered the Peattie declaration as "evidence of the level of ordinary skill in the

22  art at the time of [West]'s invention".  (C&C's Opp'n to West's Mot. for Leave to Submit

23  Additional Evidence, Ex. 4 (excerpts of the '304 application appeal brief) at 3. *See also* Peattie

24  Decl.¶ 3 (stating that "I am making the following statements as one of ordinary skill in the

25  metallurgical arts").)

26      The implications of the Peattie declaration are not entirely clear.  Peattie claimed

27

28      [3] The '456 application currently is pending an appeal of a final rejection.

4

1  explicitly to be "one of ordinary skill in the metallurgical arts". ( Peattie Decl. ¶ 9.)  However,

2  West also submitted three other declarations in connection with the '456 application – the

3  declarations of Elie Benaron (a person with twenty-five years of experience in the jewelry and

4  diamond industry), Jason Robbins (a person with "extensive knowledge" of jewelry design,

5  manufacture, and retail), and Malcolm Koll (a person with thirty years of experience in the

6  jewelry business) – and each of these declarants claimed to be persons of ordinary skill in the art.

7  (*See* Declarations of Benaron, Robbins, and Koll (June 29, 2007), http://portal.uspto.gov/

8  external/portal/pair (located in the "Image File Wrapper" of the '456 application).[4]  Peattie

9  declared that West's invention was non-obvious over the prior art because the "ordinary jeweler"

10  lacked the motivation and the skill necessary to make a tungsten-carbide jewelry ring.  (Peattie

11  Decl. ¶¶ 8-9.)  Because a metallurgist such as Peattie at least would have had the skill necessary

12  to make a tungsten-carbide ring, the most plausible reading of the Peattie declaration is that a

13  person of ordinary skill in the *relevant* art is not a metallurgist, but rather is a jeweler of some

14  kind.

15      The Court is satisfied that West's descriptions of the relevant art and of ordinary skill in

16  that art are adequate.  Accordingly, the Court considers the relevant art to be "jewelry finger

17  rings" and ordinary skill in the art to be "at least five years of hands on experience or supervisory

18  experience in making jewelry finger rings with a knowledge of the soft metals and conventional

19  methods, equipment and tools utilized for manufacturing and finishing such rings."

20  **B.     Claim construction**

21      1.     "To Provide a Pleasing Appearance"

22      The term is recited in the '314 patent at independent claim 1 (emphasis added):

23      1. A method of making a jewelry ring which comprises:
        providing an annular finger ring made of a hard material . . . and;
24      grinding the at least one external facet to a predetermined shape *to provide a pleasing
        appearance* to the jewelry ring, with the hard material being long wearing and virtually
25      indestructible during use . . . .

26  ────────────

27      [4]  The Benaron, Robbins, and Koll declarations were aimed at the commercial success of
    West's rings, while the Peattie declaration was aimed more squarely at what a person of ordinary
28  skill in the art would have understood a time of the invention.  (*See Id.*)

The parties propose the following construction:

| Term | West's proposed construction | C&C's proposed construction |
|------|------------------------------|------------------------------|
| To provide a pleasing appearance | No construction required.<br><br>In the alternative, to provide a facet having a surface contour which is frusto-conically shaped, flat, angled at a range of 1 to 40 degrees, or curved. | Indefinite under 35 U.S.C. § 112 |

West argues that the term does not require construction because it merely describes the intended results of following the claimed method rather than providing a limitation on the method. C&C argues that the term provides a limitation on the claim that renders the claim indefinite because what constitutes "a pleasing appearance" is inherently subjective. Both parties cite a number of cases to support their respective positions.

### a.    "To provide"

West contends that a "to provide clause" should be given the same treatment as a "whereby clause". In *Israel v. Cresswell*, 166 F.2d 153, 154 (C.C.P.A. 1948), the court observed that "as is presumed to be true in all cases in which the claims have a whereby clause, the clause states the result. The result, of course, is not patentable and when stated it adds nothing to the patentability of a claim. It does not detract from a claim, however, to express the result in proper phraseology and it is not objectionable." This proposition from *Cresswell* has been applied to "whereby" clauses, "to preclude" clauses, "such that" clauses, and "thereby" clauses. *See Texas Instruments v. United States ITC*, 988 F.2d 1165, 1172 (Fed. Cir. 1993) (finding that a "whereby" and a "to preclude" clause were not limitations but merely recited the physical result of arranging the components of the claims in the manner recited in the claims), *Stimsonite Corp. v. Nightline Markers, Inc.*, 33 F. Supp. 2d 703, 707 (N.D. Ill. 1999) (find that a "whereby" clause was not a limitation but merely "states the requisite consequence of forming [the invention] with the dimensions set forth in the [patent's] claims"), *Ideal Instruments*, 498 F. Supp. 2d at 1196-97 (finding that a "such that" clause's reference to magnetism was not a limitation but rather

6

described the intended result using "stainless steel which is magnetic or magnetizable" as provided by the claims), and *Thermal Dynamics Corp. v. TATRAS, Inc.*, No. 04-152-PB, 2004 WL 4957314, at *6 (D.N.H., Dec. 9, 2004) (finding that "thereby producing a longer wearing electrode" was not a limitation but was merely the result of forming ridges along an electrode, as described in the claim).  Irrespective of the exact words used to introduce a result, these cases imply that a description of the result of the claim does not add a limitation to the claim.

However, even accepting West's argument, terms *within* a "whereby clause" may be limitations if they state a condition that is material to patentability.  *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329 (Fed. Cir. 2005).  In each of the cases cited by West, the "whereby clause" stated merely the results of the claim's structural limitations.  For example, in *Texas Instruments*, one of the claims at issue read: "whereby the fluid will not directly engage the device and electrical connection means at high velocity, and the conductors will be secured against appreciable displacement by the fluid."  988 F.2d at 1171.  The Federal Circuit concluded that the "whereby clause"  "merely describe[s] the result of arranging the components of the claims in the manner recited in the claims: the fluid does not directly engage the device and the electrical connection means because the gate through which the fluid enters is remote from them".  *Id.* Here, a "pleasing appearance" is not necessarily the result of method recited in the claims.  It is entirely possible to grind a facet into some predetermined shape that does not result in a pleasing appearance.  Thus, the term adds a limitation to the claim.

> **b.      "Pleasing appearance"**

The term "pleasing appearance" necessarily has a purely subjective meaning.  "[W]hen faced with a purely subjective phrase . . . , a court must determine whether the patent's specification supplies some standard for measuring the scope of the phrase."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005).  "While beauty is in the eye of the beholder, a claim term, to be definite, requires an objective anchor."  *Id.* at 1350.  The specification of the '314 patent refers to "pleasing" only once, and in that instance the term is used to describe an insert rather than the result of grinding an external facet to a predetermined shape.  ('314 patent, col. 7 ln. 65 - col. 8 ln. 3.)  The specification does not provide explicitly an

7

1    objective standard to measure whether the insert is "pleasing".

2         However, the specification does use the word "esthetic" twice to describe a ring.  As that

3    term commonly is understood, "esthetic" is a variation of the word "aesthetic".  (*See* Oxford

4    English Dictionary, 2d. ed.)  As an adjective used to describe an object, the modern definition of

5    "aesthetic" is "[o]f or pertaining to the appreciation or criticism of the beautiful."  (*Id.*)  Figure 15

6    illustrates "highly polished facets" that "create a unique design and visual impression heretofore

7    not possible using prior art rings making techniques and technologies, because if such

8    configuration had been made, the peaks would have quickly been eroded, destroying the *esthetic*

9    appearance of the ring."  ('314 patent, col. 7 lns. 59-64 (emphasis added).)  The specification also

10   describes jewelry "where the hard metal [tungsten carbide] is used for both *esthetic* and structural

11   strength purposes."  (*Id.* at col. 8 lns. 58-61 (emphasis added).)  "[T]he cosmetic surfaces of the

12   hard metal are ground to have a faceted look.  These facets are unique to hard metal

13   configurations in that precious metal is too soft and facet edges formed in such soft metals would

14   wear off readily with normal everyday use."  (*Id.* at col. 8 ln. 66 - col. 9 ln. 3.)  Each time the

15   specification uses the term "esthetic", it is referencing the facets of the ring.  Under the

16   circumstances, a person skilled in the art, reading the specification, would understand that the

17   facets described by the specification "pertain to the appreciation or criticism of the beautiful".

18        The specification describes several types of facets.  It refers to "frusto-conically shaped

19   facets", ('314 patent, col. 3 ln. 50), "facets having surface angles of 1 to 40 degrees relative to the

20   axis of symmetry of the body", (*id.* at col. 3 lns. 53-54), and "facet[s] . . . includ[ing] both

21   cylindrical and frusto conical surfaces as well as planar or flat surfaces."  (*Id.* at col. 9 lns. 16-

22   18.)  Grinding an external facet to one of the shapes described in the specification is intended to

23   result in an aesthetic appearance (i.e., a beautiful or "pleasing" appearance).  Rather than

24   importing limitations in the claims, as suggested by C&C, the specification provides an objective

25   anchor to the otherwise purely subjective term "pleasing appearance."

26        C&C concedes that the references in the specification to particular types of facets may be

27   helpful to an understanding of the term "predetermined shape," but it argues that an

28   understanding of the types of facets is not helpful in construing the term "pleasing appearance".

8

1    "However, 'proper claim construction . . . demands interpretation of the entire claim in context,

2    not a single element in isolation.'" *Pause Tech. LLC v. TiVo Inc.*, 419 F.3d 1326, 1331 (Fed. Cir.

3    2005) (citing *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir.

4    1999)).  Further, "[a] claim is indefinite only if the claim is insolubly ambiguous, and no

5    narrowing construction can properly be adopted.  [Citation.]  If the meaning of the claim is

6    discernible, even though the task may be formidable and the conclusion may be one over which

7    reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on

8    indefiniteness grounds."  *Honeywell Int'l, Inc. v. United States*, 596 F.3d 800 (Fed. Cir. 2010)

9    (internal citations and quotation marks omitted).  Reading the entire claim in context, a person of

10    ordinary skill in the art would understand that a pleasing appearance results from grinding an

11    external facet to certain predetermined shapes as described in the specification.  These

12    predetermined shapes describe and inform what constitutes a pleasing appearance for purposes of

13    claim 1.

14          Accordingly, the Court will adopt the following construction of "pleasing appearance":  a

15    facet having a surface angles of 1 to 40 degrees relative to the axis of symmetry of the body or a

16    cylindrical or frusto-conical shape.[5]

17          2.    "Substantially Different Visual Effect"

18          This term appears in the '314 and '972 patents.  "Substantially different visual effect" is

19    recited in the '314 patent at dependent claim 10 (emphasis added):

20          10.  The method of claim 1[6], which further comprises providing a cavity in the annular
           ring, the cavity having a predetermined size and shape that is configured to receive an
21          insert of a decoration component that provides a *substantially different visual effect* to the
           jewelry ring.
22

23    _____

24          [5] West contends that an "esthetic" facet also may be curved, pointing to claim 22 of the
      '314 patent, which reads "[t]he method of claim 1, wherein at least one facet is curved".
25    However, it is axiomatic that the addition of a limitation in a dependent claim implies that the
      limitation is not present in the independent claim.  *Phillips*, 415 F.3d at 1315.  Accordingly, for
26    purposes of claim 1, the facet is not curved.

27          [6] Claim 1 describes "[a] method of making a jewelry ring which comprises: providing an

28    annular finger ring made of a hard material consisting essentially of tungsten carbide . . . ."

9

The term "substantially different visual effect" also is recited in the '972 patent at dependent claim 11 (emphasis added):

> 11. A finger ring comprising:
> an annular ring . . . wherein the annular ring includes a cavity . . . that is a continuous slot which extends entirely around the annular ring; and a decoration component . . . disposed in the slot to provide a *substantially different visual effect* to the ring.

The parties propose the following construction:

| Term | West's proposed construction | C&C's proposed construction |
|------|------------------------------|------------------------------|
| "Substantially different visual effect" | No construction required.<br><br>In the alternative, a noticeably different visual effect relative to the hard material | Indefinite under 35 U.S.C. § 112 |

West contends that the term does not require construction because it merely describes the result of placing a decoration component into the slot or cavity of the annular ring. Similar to the term "pleasing appearance" discussed above, the term "substantially different visual effect" does not state merely the results of the structural limitations of the claim. Conceivably, certain decoration components or cavities may provide only a minimally different visual effect, which would not satisfy the elements of the claim.

C&C argues that West's use of "substantial" cannot be ignored. West reasons that "visual effect" describes something that is noticeable to the viewer. C&C points out that claim 14 of the '314 patent includes the term "visually different".[7] C&C therefore contends that the term "substantially different visual effect" must mean something more than "visually different." *See D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed. Cir. 1985) (noting that "[w]here some claims are broad and others narrow, the narrow claim limitations cannot be read into the

---

[7] Claim 14 of the '314 patent provides (emphasis added):

14. The method of claim 10, which further comprises providing an insert of a *visually different* hard material, a precious metal or a gemstone in the cavity that extends into the annular ring, wherein the annular ring is integrally formed as a hardened substructure and the insert is provided in the cavity therefor.

10

1   broad whether to avoid invalidity or to escape infringement).  However, "visually different" is

2   not necessarily the same term as a "different visual effect."

3          Claim 14 is dependent from claim 10.  Claim 10 discloses an annular ring with a cavity

4   that is "configured to receive an insert of a decoration component that provides a substantially

5   different visual effect" to the "jewelry ring" as a whole.  Claim 10 discusses the *effect* the insert

6   will have with respect to the annular ring.  Claim 14 "further comprises providing an insert of a

7   visually different hard material, a precious metal or gemstone in the cavity" of the ring.  The

8   reference to "visually different" in claim 14 thus distinguishes the insert and the hard metal that

9   comprises the annular ring, rather than describing the effect of combining the insert and the

10  annular ring.  The claims use different terms to describe different aspects of the invention.

11         That said, the patentee chose to include the word "substantial" in the claim limitation.

12  "When a word of degree is used the district court must determine whether the patent's

13  specification provides some standard for measuring that degree." *Datamize*, 417 F.3d at 1351

14  (citing *Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir.

15  1984)).  West, pointing to the patent's specification and prosecution history, argues that whether

16  the visual effect is substantial should be measured with reference to the hard material.  The term

17  "substantially different visual effect" appears once in each patent's specification:

18         FIGS. 9-10 depict two-groove embodiments of both sintered metal and ceramic
        substructures at 76 and 78 respectively, each having precious metal or other inserts 80
19      and 82 formed in the annular grooves thereof, with the exterior surfaces of the inserts of
        the rings being treated differently to achieve *substantially different visual effects*.
20
21  ('314 patent, col. 7 lns. 13-22, '972 patent, col. 7 lns. 13-22 (emphasis added).)  As it appears in

22  the specification, the term describes the treatment of the exterior surfaces of the inserts of the

23  rings.  While the specification discusses treatments that can provide substantially different visual

24  effects, the specification does not indicate what those treatments are.  West also points to parts of

25  the specification that discuss combining precious metals or other inserts with the hard material.

26  (*See* '972 patent, col. 4 lns. 3-5 and 24-27; col. 6 lns. 37-43.)  However, these parts of the

27  specification do not refer to any visual effect that is created by doing so.

28         West points to an amended claim in the '972 patent that later was canceled during

                                                11

1    prosecution by an examiner's amendment.  The amendment read "[a] decoration component that

2    provides a different visual effect to the ring *relative to the hard material*." (emphasis added).

3    West argues that "substantially different" should be measured in reference to a noticeable

4    difference between the decoration component and the hard material.  C&C argues that it is

5    improper to consider the effect of an amended claim that was canceled during prosecution.  The

6    claim in the issued patent does not include the reference to the hard material, and C&C is correct

7    in its assertion that it would be inappropriate for the Court to rewrite the issued claim to include

8    language that was canceled during prosecution.  Even if West's points were accepted, the words

9    "relative to the hard material" do not provide a useful standard for measuring the substantiality of

10   a visual effect.  West's argument provides a reference point, but it does not complete the

11   necessary analysis with respect to what the difference must be in order to be "substantial".

12          However, West also offers the declaration of Marc A. Kuppersmith, who meets the

13   qualifications of a person having ordinary skill in the art.  Kuppersmith asserts that one of

14   ordinary skill in the art would understand that the "visual effect" is relative to the hard material

15   of the ring body.  (Kuppersmith Decl. ¶ 23.)  He also asserts that one of ordinary skill would

16   understand that a noticeable difference or contrast between the visual impression of decoration

17   component and the hard body of the ring creates a "substantially different effect." (*Id.*)  In

18   support of his opinion, Kuppersmith discusses ring making practices in the industry at the time of

19   the invention.  (*Id.*)  He notes that "ring makers might, for example, include a decoration

20   component that is made from a different material or has a different color or texture or finish

21   which would provide a different visual impression as compared to the hard tungsten carbide

22   material body of the ring." (*Id.*)  As noted above, the specifications discuss a similar practice.

23          Kuppersmith's declaration does not suggest that a person having ordinary skill in the art

24   would understand "substantially different effect" to mean *any* noticeable difference between the

25   visual impression of the decoration component and the hard body of the ring.  Rather,

26   Kuppersmith discusses the common use of a decoration component that is "made from a different

27   material or has a different color or texture or finish" to provide different visual impressions

28   relative to the hard body of the ring.  The specification also discusses inserts made of different

12

materials or with different exterior surface treatments.  Kuppersmith's opinion supports a

conclusion that a person of ordinary skill in the art, reading the claims and the specification,

would understand that a "substantially different visual effect" is achieved when the decoration

component inserted into the cavity of the ring is made from a different material, has a different

color, or has a different texture or finish.

Accordingly, the Court will construe "substantially different visual effect to the ring" to

mean "visibly noticeable difference or contrast between the hard body of the ring and a

decoration component made from a different material from the hard body of the ring or having a

different color, texture, or finish from the hard body of the ring."

3. _Defining an aperture configured and dimensioned to receive a person's finger_

The term is recited in the '314 patent at independent claim 1 (emphasis added):

1. A method of making a jewelry ring which comprises: providing an annular finger ring
. . . , with the annular ring . . . _defining an aperture configured and dimensioned to
receive a person's finger_ . . .

The parties propose the following construction:

| Term | West's proposed construction | C&C's proposed construction |
|---|---|---|
| Defining an aperture configured and dimensioned to receive a person's finger | No construction necessary | Defining an aperture having a shape and size capable of receiving a person's finger |

West disputes C&C's proposed "capable of" construction because it conceivably would

include "a napkin ring or any tubular shaped machine part".  (West's CC Brief at 18.)  Though

West does not offer a specific construction, his arguments make clear that he interprets the term

to indicate some degree of intent with respect to the design of the aperture.  C&C disputes this

interpretation because it would define the term based on "the state of mind of the manufacturer."

(C&C's CC Brief at 15.)

West contends that the words of the term are plain and understandable on their face and

that no construction should be necessary.  "In some cases, the ordinary meaning of claim

language as understood by a person of skill in the art may be readily apparent even to lay judges,

and claim construction in such cases involves little more than the application of the widely

accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.  However, "[a]

determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning'

may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a

term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond

Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

### a.    The specification

Though the term "dimensioned" appears only in claim 1, the '314 patent's specification

uses the term "configured" several times to describe the preferred embodiments.  (*See*, *e.g.*, '314

patent, col. 4 lns. 43-46 (. . . a compressive mold is depicted . . . including an annular cavity . . .

generally illustrated and *configured* to receive a quantity of powdered, hard metal . . .) (emphasis

added), '314 patent, col. 5 lns. 26-27 (the outer surface is *configured* to have cylindrical flats . . .

on opposite sides of [the] grove . . .) (emphasis added), '314 patent, col. 5 lns. 29-30 ("[a]s an

alternative, the facets . . . may be *configured* to have multiple facet surfaces.") (emphasis

added).)  The specification itself does not appear to confer any specialized meaning that would be

helpful in resolving the dispute between the parties.

### b.    The prosecution history

C&C points to the prosecution history of the '314 patent to support its argument.  "A

patentee may, through a clear and unmistakable disavowal in the prosecution history, surrender

certain claim scope to which he would otherwise have an exclusive right by virtue of the claim

language." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009) (citing

*Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006)).  In this case,

a previous version of claim 1 was directed to jewelry articles that included more than just finger

rings, and the USPTO had rejected that version of claim 1 in part because West's evidence of

commercial success was limited only to finger rings.  West amended the claim so that it was

directed more specifically towards jewelry finger rings.  (C&C's CC Brief Ex. 7 at C&C006739.)

However, this history does not provide useful insight into the meaning of "configured and

dimensioned".

Case No. C-09-1303 JF (HRL)
ORDER CONSTRUING CLAIMS OF UNITED STATES PATENTS
(JFEX1)

C&C also points to the prosecution history of the '972 patent.[8]  West amended the claims

of that application to overcome the Lederrey reference, U.S. Patent Number 3,242,664, which

disclosed a tungsten-carbide watch case.  The examiner had rejected an earlier version of the

claim that called for "an aperture configured and adapted to receive a body part".[9]  The examiner

explained that "the circular aperture of the ring shown in Fig. 3 of Lederrey is 'capable of'

receiving a body part such as a finger".  (C&C's CC Brief Ex. 9 at C&C008578.)  Following the

rejection, West amended the claim to read "configured and adapted to receive a finger."[10]  C&C

argues that the examiner's comment illustrates that the language "configured and adapted to" has

the same meaning as "capable of".  It therefore contends that West's amendment should be

construed as limiting the invention to rings that are "capable of" receiving only a finger.  (C&C's

CC Brief at 14.)

However, although he amended the claim, West disagreed expressly with the examiner's

interpretation, arguing that "Lederrey . . . [is] directed to watch casings, *which are not configured*

*and adapted to receive a body part, much less a finger*".  (C&C's CC Brief Ex. 9 at C&C008559

(emphasis added).)  West argued that while Figure 3 of the Lederrey patent may have been

_____

[8]The '972 patent and the '314 patents arose from common applications.  "[T]he prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application."  *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004).

[9]  For the present discussion, the Court will assume without deciding that "configured and adapted to" is comparable to "configured and dimensioned to".  The rejected claim provided that:

16.  (Currently Amended) The jewelry article of claim 1, ~~in the form of a ring, earring, or bracelet wherein the annular body has a generally circular configuration~~ <u>wherein the annular ring comprises a ring, earring, or bracelet that includes an aperture configured and adapted to receive a body part</u> . . .

[10]  Following the rejection, West amended the claim as follows:

16.  (Currently Amended) The jewelry article of claim 1, wherein the annular ring comprises a <u>finger</u> ~~ring, earring, or bracelet~~ that includes an aperture configured and adapted to receive a <u>finger</u>~~body part~~ . . . .

(C&C's CC Brief Ex. 9 at C&C008551.)

1   *capable of* receiving a body part, it was not *configured and adapted* to do so.  Rather than

2   disavowing claim scope, West argued that "configured and adapted to" is not equivalent to

3   "capable of".  It is reasonable to infer that West also would have similarly objected to equating

4   "configured and dimensioned to" and "capable of".

5          West explained the change from "adapted and configured to receive a body part" to

6   "adapted and configured to receive a finger" by noting that the claims "have been amended to

7   more clearly and distinctly recite that the ring is a <u>finger ring</u> and that the aperture is configured

8   and dimensioned to receive a <u>finger</u> in particular." (C&C's CC Brief Ex. 9 at C&C008555

9   (emphasis in the original).)  As with the '314 patent, this aspect of the amendment appears to be

10  aimed at narrowing the scope of the claim to fit the evidence of commercial success of West's

11  finger rings rather than to claim other types of jewelry.  The record thus contains sufficient

12  evidence to support a conclusion that West did not make a clear and unmistakable disavowal of

13  claim scope during the prosecution history.

14                    c.      **Ordinary meaning**

15         Though the prosecution history has illuminated what West did *not* intend the term to

16  mean, neither the specification nor the prosecution history are particularly useful in providing

17  information as to what the term *does* mean.  A patentee may be his own lexicographer, but he

18  certainly does not have to be, and a patentee also may rely on the ordinary meaning of terms if he

19  does not wish to impart any special meaning to the term.  The Oxford English Dictionary, 2d ed.,

20  defines "configure", in relevant part, as "[t]o fashion according to something else as a model; to

21  conform in figure or fashion".  The Oxford English Dictionary, 2d ed., offers two definitions of

22  "dimension" as a verb.  Rarely, the term is defined as "[t]o measure or space out; to reduce to

23  measurement."  (*Id.*)  More commonly, the term means "[t]o mark the dimensions on (a working

24  drawing, diagram, or sketch)" or "the action of marking dimensions".  In relevant part, the word

25  "dimension", as a noun, is defined as "[m]easurable or spatial extent of any kind, as length,

26  breadth, thickness, area, volume; measurement, measure, magnitude, size."  *Id.*

27         In the context of patents focused on "jewelry", the use of "configure" and "dimension"

28  indicates that the aperture is fashioned or measured to conform to person's finger, rather than

16

1    being merely "capable of" receiving a finger.  Accordingly, the Court will construe "defining

2    an aperture configured and dimensioned to receive a person's finger" to mean "defining an

3    aperture fashioned to have a spatial extent to conform to a person's finger."  Perhaps unfortunately, this

4    construction necessarily relies to some extent upon the intent of the designer: a aperture "capable

5    of" receiving a person's finger would fall within this term's scope only if the aperture actually

6    was fashioned to ensure that it conformed to a person's finger.

7         C&C argues that a construction that relies on the subjective intent of the designer is

8    inappropriate.  Its own proposed construction of the term is objective: either the aperture is

9    capable of receiving a person's finger or it is not.  C&C relies upon case law concerning

10   apparatus claims.  *See, e.g., Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1091 (Fed.

11   Cir. 2009) (finding that "[c]onstruing a non-functional term in an apparatus claim in a way that

12   makes direct infringement turn on the use to which an accused apparatus is later put . . . is

13   inconsistent with the notice function central to the patent system."), *id.* (finding that "[a]bsent an

14   express limitation to the contrary, any use of a device that meets all of the limitations of an

15   apparatus claim written in structural terms infringes that apparatus claim"), and *Hewlett-Packard*

16   *Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) (finding that "apparatus

17   claims cover what a device is, not what a device does.").

18        However, West is not claiming what the ring does.  Rather, as long as the aperture is

19   "configured and dimensioned to receive a person's finger", the aperture would fall within the

20   scope of the term regardless of the use to which the aperture is later put.  In *Jansen v. Rexall*

21   *Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003), the Federal Circuit concluded that a

22   preamble to a claim could serve as "a statement of the intentional purpose for which the method

23   must be performed."  While the phrase "configured and dimensioned" does not appear in the

24   preamble of the claim, it still suggests the intentional purpose for one of the steps of the method:

25   the ring must be fashioned according to a persons finger as a model.

26        C&C correctly points out that relying on the subjective intent of the designer could create

27   significant – though perhaps only hypothetical – problems.  The Court itself raised this concern at

28   the claim construction hearing in the context of a hypothetical manufacturer of industrial

17

1  bushings with apertures capable of receiving a person's finger.  Under the above construction, the

2  apertures would not infringe even if worn on a person's finger because they were not intended to

3  conform to a person's finger but rather to function as industrial components.  But, what if the

4  manufacturer were to sell the same industrial bushings to jewelry stores?  The design of the

5  aperture would not have changed.  Would the act of measuring the aperture to provide for

6  standardized ring sizes transform an industrial bushing into an infringing ring?  Would such a

7  transformation apply only to bushings sent to jewelry stores or to all bushings, including

8  bushings still used in industrial applications?  Would the manufacturer infringe if the jewelry

9  store, rather than the manufacturer itself, measured the bushings to conform to ring sizes?

10      The Court concludes that while these concerns may well be appropriate in an

11  infringement or validity analysis, they do not preclude claim construction.  As asserted by West,

12  the claim at issue does not contemplate an aperture that can receive a finger merely by chance.

13  West argued specifically during prosecution that not every aperture "capable of" receiving a

14  finger is "configured and adapted/dimensioned" to receive a finger.  The language of the patent

15  suggests that at least some purposeful intent is required.

16      4.    "Insert" and "Decoration Component"

17      These two terms appear together in the '314 patent, and "decoration component" appears

18  alone in the '972 patent.  The terms "insert" and "decoration component" are recited in the '314

19  patent at dependent claim 10 (emphasis added):

20      10.  The method of claim 1, which further comprises providing a cavity in the annular
21      ring, the cavity having a predetermined size and shape that is configured to receive an
        *insert* of a *decoration component* that provides a substantially different visual effect to the
22      jewelry ring.

23  The term "insert" also is recited in dependent claim 14 (emphasis added):

24      14.  The method of claim 10, which further comprises providing an *insert* of a visually
        different hard material, a precious metal or a gemstone in the cavity that extends into the
25      annular ring, wherein the annular ring is integrally formed as a hardened substructure and
        the insert is provided in the cavity thereof.

26      The term "decoration component" appears in independent claims 1 and 11 and dependent

27  claims 12 and 13 of the '972 patent.  A representative claim is set forth below (emphasis added):

28      11.  A finger ring comprising: an annular ring . . . comprising predominantly tungsten

18

carbide, . . . wherein the annular ring includes a cavity . . . that is a continuous slot which extends entirely around the annular ring; and a *decoration component* comprising a precious metal disposed in the slot . . . , wherein the *decoration component* forms a second annular ring in the slot . . . .

The parties propose the following construction:

| Term | West's proposed construction | C&C's proposed construction |
|------|------------------------------|------------------------------|
| Insert | No construction required | An insertable part |
| Decoration component | No construction required | A separate decorative part |

West argues that no construction is necessary because the terms have common meanings that have not been altered by evidence in the intrinsic record. He contends that C&C's attempts to construe the terms merely introduce further ambiguity and confusion. C&C's proposed definition for the phrase "insert of a decoration component", as it appears in the '314 patent, would result in the following: "an insertable part" of "a separate decorative part". West also disputes C&C's proposed construction of "decoration component" because it "attempts to improperly impose a separateness limitation on the term." (West's CC Brief at 19.)

Neither party disputes that "insert", as used in the claim, is a noun. In each instance in which the term appears in the claims, it is preceded by an indefinite article, which makes it clear that "insert" is being used as a noun and not as a verb. The specifications do not impart any special meaning to the term, and construction involves "little more than the application of the widely accepted meaning of commonly understood words," *Phillips*, 415 F.3d at 1314. Accordingly, construction of "insert" is unnecessary.

With respect to "decoration component", C&C is particularly concerned that unless "decoration component is construed to be a separate piece, a "decoration component" could be interpreted as a "surface coating" or a "unitary ring design". (C&C's CC Brief at 12.) C&C points to the prosecution history to support its argument that "decoration component" cannot support such an interpretation, noting that the patent examiner restricted all claims related to surface coatings and unitary ring configurations. (C&C's CC Brief Ex. 9 at C&C008522.)

The Court agrees that a decoration component must be distinct from the tungsten-carbide ring. In claim 10 of the '314 patent, the term "decoration component" modifies "insert". Under

19

1    its widely accepted meaning, an insert is a separate part.  It would make little sense to "insert" the

2    "decoration component" if it already were part of the ring.  In claims 1 and 11 of the '972 patent,

3    the "decoration component" is "disposed in" a "slot" that "extends entirely around the annular

4    ring".  The "decoration component" also "comprises a precious metal", while the ring is

5    "predominantly tungsten-carbide".  In claim 12 of the '972 patent, a metal material is disposed

6    into the slot to "facilitate retention of the decoration component therein".  In claim 13 of the '972

7    patent, resin is used to "facilitate retention of the decoration component therein".  It would be

8    unnecessary to facilitate retention of the decoration component if it was not a separate part.  The

9    specification of the '972 patent provides that "precious metal components, jewels and other

10   decoration components may be affixed to the hard metal or ceramic part." ('972 patent, col. 6,

11   lns. 16-23.)  The claims and the specification consistently refer to a "decoration component" as a

12   piece separate from the tungsten-carbide ring.

13          Accordingly, the Court will adopt C&C's proposed construction of "decoration

14   component".  The phrase "an insert of a decoration component", as it appears in the '314 patent

15   will be construed as  "an insert of a separate decorative part".

16          5.    Fills a width of the slot

17          The term is recited in the '972 patent at independent claim 11 (emphasis added):

18          11. A finger ring comprising: an annular ring . . . wherein the annular ring includes a
             cavity of a predetermined size and shape that is a continuous slot which extends entirely
19           around the annular ring; and a decoration component . . . disposed in the slot . . . wherein
             the decoration component forms a second annular ring in the slot that *fills a width of the
20           slot* continuously around the annular ring . . . .

21   The parties propose the following construction:

22
| Term | West's proposed construction | C&C's proposed construction |
|---|---|---|
23
| Fills a width of the slot | Fills a portion of the side to side distance between the walls of the slot | Fills up the width of the slot |
24

25

26          West argues that his construction is proper because the term specifies that the decoration

27   component "fills *a* width of the slot" rather than "*the* width of the slot".  Essentially, he contends

28   that "a width of the slot" is synonymous with "a portion of the width of the slot".  The balance of

                                                    20

1   his proposed construction is based on the Oxford Dictionary definition of the term "width".

2   However, West's proposal to define "width" is unnecessary.  Neither the claim nor the

3   specification give special meaning to the word, which otherwise has a plain and ordinary

4   meaning.

5          C&C argues that the claim term must refer to filling the entire width of the slot.  It

6   contends that the plain and ordinary meaning of "a width" is a reference to the entire width rather

7   than only a portion of the width.  It also argues that the indefinite article for "*a* width" was

8   chosen only to avoid an antecedent problem.  However, because a slot necessarily contains a

9   width, a reference to "*the* width" would not have been a basis for rejection.  *See Astra Aktiebolag*

10  *v. Andrx Pharms.*, *Inc.*, 222 F. Supp. 2d 423, 458 (S.D.N.Y. 2002) (concluding that the term

11  "alkaline reacting compound" must necessarily require the creation of a "micro-environment",

12  therefore the claim's use of "*the* micro-environment" without ever having previously used the

13  specific term did not create an antecedent problem).

14         C&C next points to the prosecution history, in which the examiner distinguished West's

15  invention over the Grossman device in view of the Lederrey patent described previously.

16  (C&C's CC Brief Ex. 9 at C&C008435.)  The Grossman reference discloses a jewelry finger ring

17  that comprises two separate ring-shaped bands.  (*See* C&C's CC Brief Ex. 10.)  The first band is

18  larger and contains a channel that runs continuously around the outer surface of the ring.  The

19  second band is smaller and is placed into the channel of the larger band.  To prevent lateral

20  movement of the second band in the channel of the first band, portions of the second band in the

21  Grossman reference are required to extend the full width of the channel in order to engage the

22  side flanges of the first band.  (C&C's CC Brief Ex. 10 at 3-4.)  However, between those

23  portions, the second band is cut out or carved to expose portions of the channel of the first band.

24  (*Id.*)

25         The examiner distinguished West's invention over Grossman by stating that "Grossman

26  discloses [that] the second annular ring [] does not fill *a* width of the slot [] continuously around

27  the [first] annular ring . . ., and Grossman fails to disclose any recess in the outer surface of the

28  second annular ring." (C&C's CC Brief Ex. 9 at C&C008435 (emphasis added).)  C&C notes

                                        21

1   that Grossman's second band did not have a continuous width:  parts of the band extended to the

2   walls of the channel, but the band was narrower in between those parts.  However, West's second

3   annular ring still may fill a continuous width of the slot without filling the entire slot.  The

4   examiner's comment merely reflects the fact that West's second annular ring must continuously

5   fill the *same* width of the slot around the ring, unlike the Grossman reference which varied in

6   width around the ring.

7          The Court is convinced that the entire width of the slot need not be filled.  The claim

8   language uses "*a* width", and the prosecution history cited by C&C does not support its

9   argument.  Accordingly, "fills a width of the slot" will be construed to mean "fills a constant

10  portion of the width of the slot".

11         6.   <u>Finger Ring</u>

12         The term is recited in the '314 patent at independent claim 1 and dependent claim 2.

13  Claim 1 provides (emphasis added):

14         1. A method of making a jewelry ring which comprises: providing an annular *finger ring*
           made of a hard material consisting essentially of tungsten carbide, with the annular ring
15         having at least one external facet and defining an aperture configured and dimensioned to
           receive a person's finger; and grinding the at least one external facet to a predetermined
16         shape to provide a pleasing appearance to the jewelry ring, with the hard material being
           long wearing and virtually indestructible during use of the jewelry ring.

17         The term also appears in several claims of the '972 patent.  Independent claim 11 is a

18  representative example (emphasis added):

19         11. A *finger ring* comprising: an annular ring made of a sintered hard material
20         comprising predominantly tungsten carbide, wherein the annular ring has at least one
           external surface that is continuous and of a width sufficient to provide an external surface
21         facet, with the facet having a polished grey mirror finish and with the hard material being
           long wearing and virtually indestructible during normal use of the *finger ring* so that the
22         facet retains its mirror finish, . . . .

23  The parties propose the following construction:

| Term | West's proposed construction | C&C's proposed construction |
|------|------------------------------|------------------------------|
| Finger ring | No construction necessary<br><br>In the alternative, ring shaped jewelry to be worn on a finger | A ring capable of receiving a person's finger |

28

22

1    As with their dispute with respect to "defining an aperture configured and dimensioned to

2    receive a person's finger", the parties' arguments concern whether the proper construction of

3    "finger ring" may incorporate to some degree the designer's intent.  West's proposed

4    construction requires that the ring is "to be worn" on a finger, rather than merely being "capable

5    of receiving a person's finger", as in C&C's proposed construction.

6    West contends that a "finger ring" must refer to jewelry.  The preamble of claim 1 of the

7    '314 patent refers to a method of making a jewelry ring.  Claim 11 of the '972 patent refers to a

8    "finger ring" with a mirror finish and a decoration component made of a precious metal.  Both

9    specifications, in the Summary of the Invention, state that "[t]he invention relates to a jewelry

10   article".  ('314 patent, col. 3 lns. 44-45 and '972 patent, col. 3 lns. 44-45.)  West does not offer a

11   specific argument for the inclusion of "to be worn on a finger".  Webster's Third New

12   International Dictionary (2002) defines a finger ring as "a metal ring worn on the finger as an

13   ornament or as a token of marriage or betrothal".

14   C&C claims, as with "defining an aperture configured and dimensioned to receive a

15   person's finger", that the prosecution history supports its construction of a "finger ring" as a ring

16   "capable of receiving a person's finger".  As discussed previously, the prosecution history does

17   not support this argument.  During prosecution, West disputed expressly the examiner's view

18   that "configured and adapted to" equates to "capable of".  Thus, he did not disavow the claim

19   scope.  Moreover, C&C's proposed construction is too broad.  Not all rings "capable of receiving

20   a finger" can be used as a "finger ring" as that term is commonly understood.  For example, a

21   compact disk is a ring capable of receiving a finger, but it could not be used as a finger ring as

22   the term is used in the specification.

23   C&C nonetheless appears to contend that the inclusion of "jewelry" in the term's

24   construction is inappropriate because the line between jewelry and other items, such as "machine

25   parts", is "virtually indistinguishable," and that machine parts also can be worn as finger rings.

26   (C&C's CC Brief at 15.)  C&C also disputes the inclusion of "to be worn" because it adds an

27   element of subjectivity into the construction.  Relying upon the same authority discussed earlier,

28   C&C argues that the claim must cover what the device is, not what it does.  *See Roberts v. Ryer*,

23

1   91 U.S. 150, 157 (1875) (finding that "[t]he inventor of a machine is entitled to the benefit of all

2   the uses to which it can be put, no matter whether he had conceived the idea of the use or not").

3   It contends that under West's construction, whether a ring infringes the patent depends on the

4   state of mind of the manufacturer or the user, i.e., whether the ring is intended to be worn on a

5   finger or not.

6      Because both the claims and the specifications refer clearly to jewelry, the Court will

7   construe "finger ring" as "a ring that is jewelry worn on a person's finger".

8      7.   Jewelry

9      The term appears in several claims of the '734 patent and the '314 patent.  Each time the

10  term "jewelry" is used in the claims, it is used as an adjective to modify "article" in the '734

11  patent and "ring" in the '314 patent.  A representative claim of the '734 patent is set forth below

12  (emphasis added):

13     16.  A method of providing a tungsten-carbide based annular *jewelry* article having a
        desired surface profile and including an annular band which comprises: providing a
14      mixture of two or more powdered materials . . . into a pressure mold . . .; compressing the
        powdered material mixture at a pressure sufficient to form an annular blank; and sintering
15      the annular blank at a temperature sufficient to form the tungsten-carbide based annular
        *jewelry* article.
16

17  The parties propose the following construction:

18
| Term | West's proposed construction | C&C's proposed construction |
| --- | --- | --- |
19| Jewelry | No construction necessary | Objects wearable as personal adornment. |

20

21     West contends that the term "jewelry" has a plain and ordinary meaning that does not

22  require construction.  While obviously there are certain items that everyone would agree are

23  jewelry in the ordinary sense, such as the Crown Jewels of the United Kingdom, reasonable

24  people might differ as to the outer bounds of what constitutes jewelry.  The term is difficult to

25  define because as it commonly is understood, jewelry is an expression of artwork.  What does

26  and does not constitute art typically is in the eye of the beholder.  Thus, while "jewelry" does

27  typically have a plain and ordinary meaning, resorting to it in this circumstance would not

28  resolve the parties' dispute.  Neither party disputes whether jewelry is for some type of personal

24

adornment.  The issue is whether jewelry must be created for that specific purpose.

As with several of the terms discussed previously, C&C contends that the term "jewelry" must be defined objectively: it proposes a construction of "jewelry" that is independent of whether the designer intended the object to be jewelry.  However, C&C's definition conflicts with the specifications of the patents in suit.  Both specifications refer to "jewelry items" as "finger rings, bracelets, earrings, body jewelry, and the like".  ('734 patent, col. 1 lns. 16-17 and '314 patent, col. 1 lns. 21-22.)  The specification of the '734 patent clearly distinguishes "jewelry items" from "medical, dental, and industrial devices or components."  ('734 patent, col. 3 lns. 55-59.[11])  In light of the specification, C&C's definition is too broad, as it would encompass at least some medical, dental, and industrial devices or components.  Read literally, C&C's definition could encompass virtually any physical object below a certain threshold size and weight that would enable the object to be hung, strapped, or otherwise tacked onto the human body, including objects such as hubcaps, water bottles, refrigerator magnets, and spark plugs.

C&C also points to several dictionary definitions of "jewelry", including:

"ornaments for personal adornment, as necklaces or cuff links, including those of base metals, glass, plastic, or the like";

"[o]rnaments, such as bracelets, necklaces, or rings, made of precious metals set with gems or imitation gems"; and

"used by a person for some purpose closely identified with his convenience or pleasure rather [than for] only a utilitarian purpose . . . ."

The second dictionary definition is inconsistent with the claims of the patents in suit which describe jewelry rings/articles made from tungsten-carbide rather than precious metals.  The third definition appears to rely on the subjective intent of the end user, defining jewelry as items used for the person's own convenience or pleasure. This definition conflicts with basic principles of patent law.  *See, e.g.*, *Paragon Solutions,* 566 F.3d at 1091 (finding that "[c]onstruing a

---

[11]   The specification reads:

Jewelry items such as finger rings, bracelets, earrings, body jewelry and the like, are particular examples of such articles.  Medical, dental, and industrial devices or components are other examples of such articles.

non-functional term in an apparatus claim in a way that makes direct infringement turn on the use to which an accused apparatus is later put . . . is inconsistent with the notice function central to the patent system."). The remaining dictionary definition is no more helpful than the specification itself, as it merely provides examples of objects that commonly are understood to be jewelry.

"A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification . . . ." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985). C&C obviously is concerned with prior art industrial bushings, which at least superficially look very much like rings that may be purchased from jewelry stores. It is concerned that without a specific construction of jewelry, the jury may well be tasked with deciding whether industrial bushings are "jewelry". While some individuals may choose to wear industrial bushings on their fingers and consider them to be jewelry, the *ordinary* meaning of the term "jewelry" does not encompass industrial components.[12] Moreover, the specification of the '734 patent distinguished jewelry from industrial components, which would include industrial bushings.

In the context of the patent and the specification, "jewelry" must be defined as "objects purposefully designed to be personal adornment". The rings described in the claims clearly are intended to be worn on a person's finger. While the specification also describes bracelets and earning as jewelry, these items are designed for the purposes of adorning wrists and ears, respectively. C&C objects to the incorporation of an element of intentionality into the construction, but where the specification requires a degree of intentionality, the construction of the term properly may include it. *See Lydall Thermal/Acoustical, Inc. v. Fed. Mogul Corp.*, 566 F. Supp. 2d 602, 617 ( E.D. Mich. 2008) (construing "tufts of fibers" as "clusters of binding fibers which have been *intentionally* needle-punched on a downstroke and which extend beyond an opposite surface of the batt.") (emphasis added). Accordingly, the Court will construe

---

[12]  For example, while William Jonathan Drayton, Jr. (a.k.a. "Flava Flav" of the rap group Public Enemy) may wear a wall clock about his neck, the plain and ordinary meaning of "jewelry" would not include wall clocks.

1    "jewelry" to be "objects intentionally designed to be personal adornment". "Finger ring" will be

2    construed as "a ring intentionally designed to be personal adornment worn on person's finger".

3              8.    Polished grey mirror finish

4         The term is recited in the '972 patent at independent claims 1 and 11. Claim 11 provides

5    (emphasis added):

6         11.  A finger ring comprising: an annular ring . . ., wherein the annular ring has at least
          one external surface that is continuous and of a width sufficient to provide an external
7         surface facet, with the facet having a *polished grey mirror finish* and with the hard
          material being long wearing and virtually indestructible during normal use of the finger
8         ring so that the facet retains its *mirror finish*, . . . .

9    The parties propose the following construction:

| Terms | West's proposed construction | C&C's proposed construction |
|---|---|---|
| Polished grey mirror finish | Smooth or shiny surface which is reflective and grey colored | Polished grey, image-reflecting finish |

14        In support of his proposed construction, West relies upon the specifications of the '972

15   patent and the '734 patent. The specification of the '972 patent provides that "[s]uch polished

16   tungsten carbide jewelry articles have a grey color and a *reflective mirror finish*". '972 patent,

17   col. 8 lns. 19-21 (emphasis added). West contends that "reflective" therefore is synonymous

18   with "mirror finish". He also points to the specification of the '734 patent, which provides that

19   "[s]urface polishing using known techniques for polishing surface may be used to achieve a

20   desired *surface finish* as well as to round or *smooth* corners between any intersecting flat or

21   faceted surfaces." ('734 patent, col. 12 lns. 59-62 (emphasis added).) West asserts that "finish"

22   is synonymous with "shiny". West also points to the Oxford Dictionary, which defines "polish"

23   as "make or become smooth or glossy; esp. by rubbing." Finally, he proposes that "grey" should

24   be construed as "grey colored".

25        C&C bases its argument on both the claim language and the prosecution history of the

26   '972 patent. Claims 5, 6, and 8 of the '314 patent describe facets polished to a "mirror finish".

27   Claim 3 of the '314 patent describes a facet polished to a "luster". Claim 4 of the '972 patent

28   describes facets polished to a "mirror luster". C&C argues that the claims distinguish between a

27

1   "mirror finish" and mere "luster".  However, it does not explain how "mirror finish" differs from

2   "luster".  The term "luster" appears only in the claims of the patents and is not defined or

3   referenced in the specification.

4          C&C also argues that West disclaimed a broad construction of "mirror finish" during

5   prosecution of the '972 patent.  The examiner objected to the phrase "mirror-type luster" on the

6   ground that it "renders the scope of the claim unclear".  (C&C's CC Brief Ex. 9 at C&C008575.)

7   The examiner recommended that West change the wording to "mirror finish", and West

8   complied.  (*Id*. at C&C008550.)  C&C contends that in so doing West disclaimed any meaning of

9   "mirror" other than the plain and ordinary meaning of the term.  For that meaning, C&C refers

10  the Court to the definition of "mirror" in the American Heritage Dictionary: "a polished or

11  smooth surface (as of glass) that forms images by reflection."  C&C contends that West's

12  proposed construction of "mirror" is too broad because all surfaces exhibit a degree of

13  reflectivity.  Finally, it also contends that "grey" need not be construed because it has a plain and

14  ordinary meaning.

15         The parties appear to be in agreement as to key aspects of the construction.  Both parties

16  cite definitions that refer to the surface as "smooth".  West also states that "a surface that 'forms

17  images by reflection' is one that is 'reflective'".  (West's Reply CC Brief at 18.)  Thus, it appears

18  that both parties agree that "mirror finish" refers to "a surface that forms images by reflection".

19  The Court agrees with C&C that "grey" need not be construed because its meaning is plain and is

20  unaltered by the specifications or the claims.  Accordingly, the court will construe "polished grey

21  mirror finish" as "smooth grey surface that forms images by reflection".

22         9.   Recessed from the at least one external surface facet

23         The term is recited in the '972 patent at independent claim 11 (emphasis added):

24         11.  A finger ring comprising: an annular ring . . . , wherein the annular ring has at least
            one external surface that is continuous and of a width sufficient to provide an external
25         surface facet, . . . wherein the facet extends concentrically and continuously around the
            circumference of the ring . . . , and wherein the annular ring includes a cavity . . . that is a
26         continuous slot which extends entirely around the annular ring; and a decoration
            component . . . disposed in the slot . . . , wherein the decoration component . . . has an
27         outer surface that is *recessed from the at least one external surface facet* so as to
            minimize contact of the outer surface with any object that contacts the finger ring.

28

                                                    28

The parties propose the following construction:

| Term | West's proposed construction | C&C's proposed construction |
|------|------------------------------|------------------------------|
| Recessed from the at least one external surface facet | Recessed relative to the outer surface of the at least one external surface facet | Recessed from an edge of the at least one external surface facet |

West asserts that "recessed from" is synonymous with "recessed relative to". C&C contends that "recessed from . . . the facet" is synonymous with "recessed from a point of origin on the facet", which apparently would mean "recessed from an edge" of the facet. While "from" does impart the sense of originating at a particular point, the word does not indicate what lies between the present location and that point of origin. Looking only to the language of the claim, the Court is not convinced that the word "from" imparts the limitation urged by C&C.

West points to the difference between the language of claim 11 and the language of other claims. Claim 1 provides that (emphasis added):

> 1. A finger ring comprising: an annular body . . . , wherein the annular body has at least two external surfaces that are continuous and of a width sufficient to provide each external surface . . . , and wherein the body includes a cavity . . . that is a continuous slot . . . and is configured to receive an insert of a decoration component . . . , with *the slot positioned between and adjacent to the facets* . . .

He argues that if he had intended that the decoration component be recessed from the edge of the facet in Claim 11, he would have drafted claim 11 with the same "adjacent to" language as in Claim 1. *See Nystrom v. Trex Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (citing *Tandon Corp. v. U.S. International Trade Com.*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) (finding that "[w]hen different words or phrases are used in separate claims, a difference in meaning is presumed. [However, d]ifferent terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper.").

C&C contends that "claim differentiation" applies only between an independent claim and its dependent claims. However, the principle of *Nystrom* is not so limited. Moreover, West also directs the Court to claim 14, which *is* dependent on claim 11. Claim 14 reads:

> 14. The finger ring of claim 11, wherein the external surface of the annular ring comprises at least two external surface facets with at least one external surface facet on

29

1    each opposing side of the slot.

2    According to West, Claim 14 recites an "adjacent slot and facet" limitation similar to that from

3    claim 1.  (West's Reply CC Brief at 19.)

4         West concedes that the embodiments depicted in the specification illustrate a decoration

5    component recessed from the edge of an external surface facet, but he contends that claims

6    generally should not be limited to the specific embodiments provided in the specification.  *See*

7    *Phillips*, 415 F.3d at 1323 (noting that "although the specification often describes very specific

8    embodiments of the invention, we have repeatedly warned against confining the claims to those

9    embodiments").  However, in *Nystrom*, 424 F.3d at 1145-46, the Federal Circuit held that the

10   term "board" could not cover non-wooden boards because the specification repeatedly referred to

11   boards as wooden and provided intricate detail as to how the boards should be sawn from logs.

12   The court noted that "Nystrom consistently used the term 'board' to refer to wood cut from a log.

13   Although there was no clear disavowal of claim scope, there was nothing in the intrinsic record

14   to support the conclusion that a skilled artisan would have construed the term 'board' more

15   broadly than a piece of construction material made from wood cut from a log."  *Id.*  C&C argues

16   that the specification of the '972 patent is similar in that it always describes the decoration

17   component as recessed from the edge of the facet.  The issue is whether a "skilled artisan" would

18   have construed the term "recessed from the at least one external surface facet" more broadly.

19        Claim 11 describes the function of recessing the decoration component from the external

20   facet as being "to minimize contact of the outer surface with any object that contacts the finger

21   ring."  The specification discusses this feature at several points.  (*See*, *e.g.*, '972 patent, col. 5 lns.

22   59-61, col. 6 lns. 64-67, col. 8 lns. 7-12, col. 8 lns. 37-41, and col. 8 lns. 49-52.)  The described

23   effect can be achieved even if the decoration component is not recessed from the edge of the

24   facet.  A skilled artisan would know that a finger ring is not so large that a facet that is "remote"

25   from the recessed decoration component could not perform this function.  As long as some point

26   on the facet is raised above the decoration component, contact between the outer surface of the

27   decoration component and other objects would be minimized, irrespective of whether or not the

28   decoration component is adjacent to the facet.  The specification cannot be read to require that

30

the decoration component always be adjacent to the edge of an external surface facet.

Finally, C&C contends that West surrendered his proposed construction during prosecution. However, the portions of the prosecution history cited by C&C fail to establish a clear disavowal of claim scope. First, C&C points to aspects of the prosecution history that merely recite the claim language or where West describes that the decoration component is recessed and protected because it is recessed. (*See* C&C's CC Brief Ex. 9 at C&C008512 and C&C008514-15.) These comments do not address the spacial configuration of the facet.

C&C also points to this comment from the examiner in the Notice of Allowance for the '972 patent:

> "Regarding claim [11], Bager . . . in view of Lederrey . . . discloses all of the limitations except for the second annular ring having an outer surface that is recessed from the at least one external surface facet so as to minimize contact of the outer surface with any object that contacts the finger ring. Although the second annular ring [from Bager] appears to have a recess in its outer surface as shown Figs. 8-9, the recessed surface is not recessed from the at least one external surface facet []. It would not have been obvious to one of ordinary skill in the art to further modify Bager (as modified by Lederrey) such that the second annular ring had an outer surface that was recessed from the at least one external surface facet so as to minimize contact of the outer surface with any object contacted the finger ring."

(C&C's CC Brief Ex. 9 at C&C008435-36.) C&C contends that the facets from the Bager reference are "structurally disconnected". (C&C's CC Brief at 23.) Accordingly, it contends that the examiner allowed the claim only because West's invention requires that the facet be situated on the edge of the slot. However, C&C misconstrues both the examiner's comment and the figures in the Bager reference. (*See* C&C's CC Brief, Ex. 11 (U.S. Patent No. 2,050,253).) Bager's device is a ring that comprises two annular rings: a larger ring and a smaller ornamental ring that is fitted into a channel in the outer surface of the larger ring. The "recess in the outer surface" of the ornamental ring, which was the subject of the examiner's comment, is not recessed from the larger ring. (*See* C&C's CC Brief, Ex. 11 at Figures 8-9 (illustrating that the ornamental ring was recessed in the center, but that its sides were not recessed relative to the facets).) Instead, the outer surface of the ornamental ring appears to be recessed only in that it was passed through a "chasing wheel" to provide ornamentation. While portions of that ring's surface are recessed in the Bager device, not all of the ornamental ring's surface is recessed

31

1  relative to facets on the larger ring and the recessed surface did not serve to protect the

2  ornamental ring.  It at least is conceivable that the examiner distinguished West's invention from

3  the Bager device for a reason other than the location of the facet relative to the slot.  Accordingly,

4  the court will adopt West's proposed construction.

5

6  IT IS SO ORDERED.

7

8  DATED: 7/6/10

9  _____
   JEREMY FOGEL
   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32